## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

MANUEL SUGHAYER,

       Plaintiff,

       v.

FIFTH THIRD BANK, N.A.
(f/k/a MB FINANCIAL BANK, N.A.),

       Defendant.

Case No. 1:20-cv-06327

Judge John Robert Blakey

## MEMORANDUM OPINION AND ORDER

Plaintiff sues her former employer, Defendant Fifth Third Bank, N.A., f/k/a MB Financial Bank, N.A., alleging discrimination based upon race, color, religion, and national origin, in violation of the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/1-102 *et seq.* (Counts I-VIII) and Title VII, 42 U.S.C. § 2000e, *et seq.* (Counts X-XI).[1] Plaintiff also alleges retaliation under the IHRA, 775 ILCS 5/6-101(A) and Title VII, § 2000e, *et seq.* [6-1]. Defendant moves for summary judgment. [41]. For the reasons explained below, this Court grants Defendant's motion.

### I.    Factual Background

The following facts come from Defendant's Local Rule 56.1 statement of undisputed facts, [43], Plaintiff's response to Defendant's statement of material facts,

---

[1] Plaintiff initially asserted a constructive discharge claim (Count IX) and a Fair Labor Standards Act retaliation claim (Count XII). But this Court dismissed those claims, *see* [25], [26], so they are no longer at issue.

[45], Plaintiff's statement of undisputed facts, [47], and Defendant's response to Plaintiff's statement of undisputed facts, [51].

On January 23, 2012, MB Financial Bank ("MB" or "the Bank") hired Plaintiff for the position of Assistant Vice President, Banking Center Manager I ("BCM") at the Bank's Tinley Park Branch. [45] ¶ 2. As a BCM, Plaintiff's primary duties included supervising Branch staff and achieving sales goals. *Id.* BCMs are assigned an officer rank, such as Assistant Vice President or Vice President. *Id.* ¶ 3. When the Bank first hired Plaintiff, it assigned Retail Sales Manager Tim Millins as her second level supervisor. *Id.* ¶ 6. Plaintiff enjoyed a positive and professional working relationship with Millins and received pay increases every year under his supervision. *Id.*

In July 2013, the Bank promoted Plaintiff to BCM III, and named her the BCM for the Burr Ridge North and Burr Ridge South Branches. *Id.* ¶ 7. Plaintiff managed these two branches for nearly 7 years. [51] ¶ 11. During this period, Plaintiff also managed the "ProStaff" group of traveling bankers. *Id.* ¶ 27. While working at MB, Plaintiff received no employee complaints and no corrective actions. *Id.* ¶ 10.

In March 2016, Esther Grosse, Talent Management at MB, notified Kathryn Drinan, Senior Vice President of Employee Relations, via email, that four employees voluntarily resigned from Plaintiff's branches within three months. [43] ¶ 8 (Ex. H; I). In that email, Grosse identifies some "common themes" from exit interviews with resigning employees at Burr Ridge, including: (1) lack of training support; (2) lack of coaching and motivation; and (3) lack of input with scheduling and vacations. *Id.*

Grosse informed Drinan that Plaintiff's then supervisor, Brian Watson, would be working with Plaintiff and Sandra Kilian, Plaintiff's assistant for both branches, on improving retention during the onboarding phase. *Id.*

In 2017, the Bank conducted a Holiday Blitz Promotion. [45] ¶ 74. Plaintiff placed second place in the contest. *Id.* (Ex. FF). Tera Nerko, another BCM in Plaintiff's region, placed first. *Id.* This contest was significant because it was a companywide sales contest, including all single branch managers at all regions. [51] ¶ 28.

In January 2018, Regional Manager Farah Huber became Plaintiff's direct supervisor, working under Millins. [45] ¶ 9. Huber, like Plaintiff, identifies as brown and Muslim. *Id.* During the one year that Huber supervised Plaintiff, they had a positive working relationship, and Plaintiff received a pay increase. *Id.* ¶ 10.

Shortly after Huber became Plaintiff's supervisor, she began to investigate complaints by multiple employees against Kilian, Plaintiff's assistant. *Id.* ¶ 12. Huber testified that multiple employees complained to her directly about Kilian's unprofessional conduct, which the employees felt "had not been previously addressed" and remained "an ongoing issue for some time." [43] ¶ 5.

As a BCM, Plaintiff was responsible for ensuring that employees in her Branches treated each other respectfully and professionally, and it was her duty to address unprofessionalism by those who directly reported to her. [45] ¶ 11. At some point during 2018, each of Plaintiff's employees came to her with complaints against Kilian. [51] ¶¶ 4–5. Plaintiff spoke with each of her team members, advising them

that she took the complaints seriously, informing them that she would speak to Huber about the situation, and requesting that they also reach out to Huber. [51] ¶ 7.

Plaintiff subsequently reported the concerns about Kilian to Huber. [51] ¶ 6. When she did, Huber thanked Plaintiff for coming to her, agreed it was a good idea that employees speak to her, and informed her that she would be taking over the investigation. *Id.* ¶ 8. The parties dispute whether Plaintiff reported the complaints about Kilian to Huber *before* any of Plaintiff's direct report employees relayed their concerns to Huber, or whether Huber first heard of the issue from Plaintiff's direct reports, before Plaintiff came to her. *See id.* ¶ 6.

Ultimately, Huber took the lead in the investigation of Kilian and interviewed all employees of Plaintiff's two Burr Ridge Branches. [45] ¶ 12. The investigation uncovered serious misconduct, resulting in Huber issuing Kilian a final warning, and eventually terminating her when her misconduct persisted. [51] ¶ 3. The parties dispute whether Plaintiff, as BCM, owed a duty only to report the complaints to her supervisor, or whether her role obligated her to handle the complaints herself, investigating and issuing a final warning, as Huber did. *Id.* ¶¶ 6, 9.

In March 2018, Huber and Deidra Smith of Human Resources conducted another investigation, this time into complaints against Veronica Ortiz, another one of Plaintiff's direct reports. [45] ¶ 15. Ortiz received a final warning for making inappropriate and unprofessional comments. *Id.* ¶ 16.

Huber required each of the employees she supervised, including Plaintiff, to

participate in monthly coaching meetings to discuss their sales goals. [51] ¶ 30. From February through June 2018, Plaintiff's low-cost deposits, certificate of deposits (CDs) and/or net Demand Deposits (DDA) fell short of her sales goals for both branches, [45] ¶¶ 17–21, and her annual sales goals remained off track. *Id.*[2] At the June 2018 meeting, Huber told Plaintiff that she needed to look at improving business deposits, DDA money market, consumer DDA, and consumer NOW accounts. *Id.* ¶ 21. Plaintiff showed improvement in some areas by August 2018, and she was at 50% of her annual goal for combined Business Banking for both branches, even though she remained short of her goal on low-cost deposits. [43] ¶ 22.

In June 2018, Plaintiff uncovered deceptive pricing practices by Payroc, a credit card processing provider partly owned by Defendant. [51] ¶ 12. She reported these practices to Stephen Ball, the Head of Business Banking at MB, and her regional manager, Huber. *Id.* Huber and Plaintiff agreed that Plaintiff should raise the concern directly with Payroc's President, Adam Oberman. [45] ¶ 41. When Oberman did not promptly resolve the issue, Plaintiff turned to Ball for assistance. *Id.*

During this process, on July 19, 2018, Plaintiff was accidentally copied on an email chain between Ball and Oberman. *Id.* ¶ 42. Earlier in the chain, Oberman

---

[2] For example, Huber testified: "As of the May 2018 meeting, at the Burr Ridge North Branch, low costs deposits were down further at negative 72% of goal and net DDA was still down 240% of goal. Ms. Sughayer's combined Business Banking annual goal for both Branches was $1.1 million but her Branches were at $21,000 after four months. To be on target to meet her Business Banking goal at the end of 2018 as of early May 2018, Ms. Sughayer's Branches would have needed to be at around $250,000." [43] ¶ 20 (Ex. J ¶ 21).

5

wrote: "This has been a huge issue with [Plaintiff] not only on this client, but honestly on a lot of her referrals and the disrespect she has displayed about my company to others." *Id.* Ball responded, "Good to know! . . . Manal is a different animal than Galina and I already understand what could have happened she can be…interesting to work with. Thanks." *Id.* Galina was another BCM, who is Caucasian, but Plaintiff does not know her national origin or religion. *Id.* ¶ 43.

Upon receiving the email, Plaintiff notified Huber. *Id.* ¶ 45. Huber requested a copy and sent it to Smith in Human Resources. *Id.* Huber promptly spoke to Plaintiff about the email, told her that she did not agree with Ball's comments, that she had already shared the email with Smith and Millins, and that Plaintiff should reach out to Smith. *Id.* ¶ 45. Plaintiff also spoke with Millins, who told Plaintiff that he did not approve of the email, was happy that Human Resources was investigating, and that Plaintiff could bring any other concerns to his attention. *Id.* ¶ 46.

Following the investigation, on July 31, 2018, Ball received a written warning from MB for his comment about Plaintiff in the email. *Id.* ¶¶ 47–48. Other than this internal complaint in July 2018, Plaintiff did not report any other concerns about discrimination, harassment, or retaliation to Human Resources. *Id.* ¶ 50.

On September 6, 2018, Huber recommended Tara Nerko and Teri Bornack for a promotion in rank from Assistant Vice President to Vice President. [45] ¶ 25. Plaintiff, Nerko, and Bornack were all BCMs; they had the same job title and responsibilities. [51] ¶ 19. There is no formal application for the Vice President position. *Id.* ¶ 14. The position was not posted or advertised, and the qualifications

6

were not "carved in stone." *See id.* ¶ 14. But according to Drinan, who was responsible for approving initial recommendations for promotion in rank, MB "had historically promoted BCMs who were consistently the very top performers and/or who have been employed with the Bank for substantial periods from Assistant Vice President to Vice President." [43] ¶ 23 (Ex. I).

Regional Managers, like Huber, in consultation with Retail Sales Manager Millins, made promotion recommendations. [45] ¶ 24. The recommendations were then reviewed by Drinan in Human Resources, and approved by Senior Vice President Retail Banking, Joe Sheils, and Executive Vice President of Consumer Banking, Brian Wildman, along with MB's full Management Committee. *Id.* ¶ 24.

In an affidavit, Plaintiff asserted that Business Banking (Stephen Ball's department), was required to sign off on her bonuses and reviewed her performance evaluations. [47] (Ex. A ¶ 15). At her deposition, Plaintiff testified that it is "common knowledge that Business Banking as a whole provides input regarding promotions." [43] (Ex. A: 108:16–22). Plaintiff testified that this is information provided to all managers, by "higher up" people like Tim Millins, and at some unspecified time, Millins told BCMs that Business Banking would be involved in the decision about who would be promoted. *Id.* at 109:3–111:20. When pressed on the basis for this claim, Plaintiff said she could not recall dates or whether Millins specifically said that individuals from Business Banking "sit down with" Millins and the other decisionmakers to decide which BCMs get promoted. *Id.*

7

Stating the opposite, Mary Valenzia, a Regional Manager in Business Banking, testified that Business Banking employees like her "played *no* role in evaluating any Retail BCM's performance, preparing their annual performance evaluations, or establishing or approving their compensation terms, such as raises or bonuses" or "determining the officer rank of any Retail employees, such as BCMs, or recommending retail employees for promotion in officer rank." [51] (Ex. GG ¶¶ 5–6) (emphasis added). Valenzia also testified that she never spoke with Huber, Millins, or any other Retail Manager about whether any Retail BCM should be promoted in rank to Vice President, including Sughayer, Nerko, or Bornack. *Id.* (Ex GG. ¶ 7).

On October 1, 2018, Huber notified the BCMs in her region that Nerko and Bornack were promoted in rank to Vice President. *Id.* ¶ 29. No other employees who reported to Huber were promoted to this position in 2018. *Id.* Prior to their promotions, both Nerko and Bornack had spoken to Huber on multiple occasions about their interest in the promotion to Vice President. *Id.* ¶ 25. Plaintiff did not speak with Huber or any of her prior or subsequent supervisors about her interest in promotion in rank to Vice President. *Id.* ¶ 30.

Before promoting Nerko, Huber had supervised her for more than six years, since June 2012. [45] ¶ 26. Nerko was consistently one of the very top performers in Huber's region. *Id.* There are no written criteria for Top BCM; but in 2014, 2015, and 2016, Huber nominated Nerko as the Top BCM in the region based upon her "extraordinary sales results in those years and her leadership skills." [51] ¶ 15; [45]

¶ 26.  In her written recommendation, Huber wrote that Nerko should be promoted because:

> Since starting as a Banking Center Manager – Assistant Vice President in June 2012, Tara Nerko has:
>
> - Been nominated as the Top BCM for my region 3 out of the 4 years.
> - Year after year, she exceeds her sales goals in every category.
> - She was nominated to be part of the exclusive Ocean's 11 that is managed by the Business Banking department for managers that do exceptionally well in business development.
> - She has always been my region's go-to person for any questions that the other managers might have. When [I] am on vacation, Tara is the point person for any work assignments that need completed and if any issues arise.
> - She successfully managed the Always-On program when we were testing it for the Marketing department.
> - She volunteered to have her branch be the beta testers for Retail's newest platform to help iron out all the kinks that went along with rolling out a new system.
> - She manages the Pro Staff.
> - At one point she managed Warrenville and Naperville before we decided to close Naperville. She did a tremendous job closing the Naperville office and retained almost all of her customers that now visit the Warrenville location.

[45] ¶ 26.

Before promoting Bornack, Huber had supervised her for more than seven years, since 2011.  *Id.* ¶ 27.  Prior to her promotion, Huber had been employed as a BCM at MB for over 16 years.  *Id.*  In her written recommendation, Huber wrote:

> Since starting as a Banking Center Manager in April 2000, Teri has demonstrated extraordinary leadership, sales ability, and stewardship of the Bank's resources. Some of her career highlights include:

9

- She has a proven record that she consistently performs at a high-level year after year.
- She was nominated as a Top BCM for my region in 2017.
- Consistently provides exceptional customer service to all her customers.
- She is well respected by her peers and staff for being knowledgeable with seasoned experience.

*Id.* ¶ 27.

At her deposition, Plaintiff testified that Huber's statements about Nerko or Bornack were true and that she was not aware of any factual basis to doubt Huber's assessment that Nerko and Bornack earned promotion in rank to Vice President. *Id.* ¶ 28.

Plaintiff testified that, in her opinion, she was equally or more qualified for the promotion to Vice President than Nerko or Bornack because of her performance, level of responsibility, and education. *See* [43] (¶ Ex. A: 159:2–163:14). Specifically, Plaintiff explained that she managed two branches, managed ProStaff prior to 2018, earned an MBA, and had strong overall performance metrics by the end of 2018. *Id.*

Huber testified that she did not consider Plaintiff for the promotion to Vice President because Plaintiff did not express interest in the promotion; she had not supervised Plaintiff for long enough to know whether to recommend her for the promotion; in the nine months Huber supervised Plaintiff, Plaintiff's branches had significant employee relations issues (which Huber had to step in to address); and sales at Plaintiff's Burr Ridge North Branch were struggling. [45] ¶ 31 (Ex. J, ¶¶ 31–34).

Plaintiff's race is Middle Eastern; her color is brown; her religion is Muslim/Islam; and her national origin is Palestinian, although she was born in the United States.  [47] ¶ 1.[3]  Nerko and Bornack are Caucasian, and non-Muslim.  [45] ¶ 25; [47] ¶ 20.  Plaintiff does know Nerko or Bornack's religion or national origin. [45] ¶ 25.

Huber was aware of Plaintiff's race and religion.  [47] ¶¶ 16, 25.  For example, at the Bank's Christmas party in December 2018, Huber gave each non-Muslim team member, including Nerko and Bornack, a Christmas tree ornament, and gave Plaintiff and the one other Muslim team member chocolate as a gift.  [51] ¶ 20.

In 2018, MB conducted two sales contests: one in August 2018, the "Almost Bye-Bye Summer Contest," which Nerko's Warrenville branch won; and a second entitled the "CD and Savings Promotion.  [45] ¶¶ 70–71.  As of October 10, 2018, Plaintiff's Burr Ridge South Branch had the highest certificate of deposit (CD) and savings balances, but Plaintiff's North Burr Ridge Branch was ranked last, having no open CD accounts and only one saving account.  *Id.*

By the end of 2018, Plaintiff's sales numbers had improved significantly at the Burr Ridge South Branch.  *Id.* ¶ 22 (Ex. J).  On January 2, 2019, Mary Valenzia emailed the regional BCMs regarding the total business balances from the end of 2018.  [51] ¶ 72.  Plaintiff's Burr Ridge Branches were ranked first for total business

---

[3] Defendant disputes that Plaintiff's national origin is Palestine because she testified in her affidavit that she was born in the United States, asserting instead that Palestine is Plaintiff's "ancestry." [51] ¶ 1.  For purposes of Title VII, national origin discrimination encompasses discrimination based upon one's ancestry.  *See Cortezano v. Salin Bank & Trust Co.*, 680 F.3d 936, 940 (7th Cir. 2012) (citing *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 89 (1973) (noting that national origin discrimination encompasses discrimination based upon ancestry but not discrimination based upon citizenship or immigration status).  Thus, this distinction remains irrelevant.

balances at the end of 2018, whereas Nerko came in third place, and Bornack did not meet her 2018 goal. *Id.*

Plaintiff represents that, in January 2019, she scored a perfect 100% on executive management certification testing. [47] ¶ 21. Plaintiff represents that Nerko and Bornack scored lower than she did but provides no support for this claim. *See id.* (Ex. A ¶ 23).

On approximately January 15, 2019, Plaintiff filed a discrimination charge with the Illinois Department of Human Rights against MB, alleging that she was harassed and discriminated against based on her race, color, religion and national origin, including being passed over for a promotion, in comparison to two white female colleagues with less education, credentials, and less banking and managerial experience in October of 2018. *Id.* ¶ 52.

At her deposition, Plaintiff testified that Huber never mentioned the charge or retaliated against Plaintiff because of it. *Id.* ¶ 53. Plaintiff testified that she does not know whether Ball knew about the charge and could not identify any specific retaliatory actions Ball took in retaliation for the charge or her internal complaint to Human Resources against him. *Id.* ¶ 54. No employee, manager, or supervisor said anything derogatory to Plaintiff about her charge or about the internal complaint against Ball. *Id.* ¶ 56.

On May 3, 2019, MB merged into Fifth Third Bank, and Plaintiff became an employee of Fifth Third. *Id.* ¶ 57. A few months later, Fifth Third closed the Burr Ridge North Branch that Plaintiff had supervised, but she continued to have the same

job title, officer rank, and rate of pay. *Id.* ¶ 60. Christina Hollivay became Plaintiff's supervisor. *Id.* ¶ 59. Hollivay testified that she did not learn about Plaintiff's discrimination charge until 2022, after Plaintiff had already resigned. *Id.* ¶ 55. Plaintiff also testified that she does not know whether Hollivay had any knowledge of the charge or the internal complaint against Ball, and Plaintiff does not know whether Hollivay retaliated against her because of her charge. *Id.* ¶ 55.

On November 15, 2019, Plaintiff tendered her written resignation from employment with Fifth Third to Ms. Hollivay. *Id.* ¶ 61.

## II.    Legal Standard

Summary judgment is proper where there is "no dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In determining whether a genuine issue of material fact exists, this Court must construe all facts and reasonable inferences in the light most favorable to the non-moving party. *King v. Hendricks Cty. Comm'rs*, 954 F.3d 981, 984 (7th Cir. 2020). The non-moving party bears the burden of identifying the evidence creating an issue of fact. *Hutchison v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1021–22 (7th Cir. 2018). To satisfy this burden, the non-moving party "must do more than simply show

13

that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Barnes v. City of Centralia*, 943 F.3d 826, 832 (7th Cir. 2019). Thus, a mere "scintilla of evidence" supporting the non-movant's position does not suffice; "there must be evidence on which the jury could reasonably find" for the non-moving party. *Anderson*, 477 U.S. at 252.

## III. Discussion

### A. Discrimination Claims

Plaintiff claims that Defendant discriminated against her based upon her race, color, religion, and national origin, in violation of Title VII and the IHRA, when it failed to promote her in rank to the position of Vice President BCM. [46] at 1.

Because the analytical framework for Title VII and the IHRA are "virtually identical," this Court addresses counts I through VIII together, under Title VII. *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 879 n.39 (7th Cir. 2016); *see also Volling v. Kurtz* Paramedic, 840 F.3d 378, 382 (7th Cir. 2016) (applying Title VII framework to IHRA claims at summary judgment stage); *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 403 (7th Cir. 2007) (noting that courts generally apply the same analysis to discrimination claims brought under IHRA and Title VII).

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016), the Seventh Circuit clarified the methods of proof in employment

14

discrimination cases. *Id.* The court explicitly instructed district courts to consider the evidence "as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Ortiz*, 834 F.3d at 765.

The holistic analysis set forth in *Ortiz* supplements, rather than alters, the burden-shifting framework for discrimination claims that the Supreme Court created in *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 793 (1973). *See Davis v. Bd. Of Trs. Of Cmty* Coll. Dist. No. 508, 846 F.3d 216, 224 (7th Cir. 2017) (discussing *Ortiz*'s impact on methods of proof in employment discrimination cases). The question on summary judgment remains, "has the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination?" *Id.* (citing *Morgan v. SVT, LLC*, 724 F.3d 990, 997 (7th Cir. 2013)).

Courts now conduct the *McDonnell Douglas* analysis if the parties present arguments "in those terms," but also assess the plaintiff's evidence "cumulatively" under *Ortiz*. *See David*, 846 F.3d at 224. Here, the parties do organize their arguments utilizing the *McDonnell Douglas* framework. Accordingly, the Court will first assess the evidence in accordance with the *McDonnell Douglas* framework and determine whether Plaintiff has established a prima facie case of discrimination. Then, it will review the record holistically, asking whether it permits a reasonable factfinder to conclude that MB failed to promote Plaintiff because of her race, religion, color, or national origin. *See Ortiz*, 834 F.3d at 765.

**(1) McDonnell Douglas Analysis**

To demonstrate a *prima facie* case for failure to promote, a plaintiff must produce evidence showing that: (1) she was a member of a protected class; (2) she was qualified for the position sought; (3) she was rejected for the position; and (4) the employer promoted someone outside of the protected class who was "not better qualified for the position." *Riley v. Elkhart Cmty. Schs.*, 829 F.3d 886, 892 (7th Cir. 2016).

If the plaintiff makes out a prima facie case by meeting each of these elements, the burden shifts to the defendant to articulate——not to prove—a legitimate, nondiscriminatory reason for the promotion decision. *See Kinney v. St. Mary's* Health, 76 F.4th 635, 646 (7th Cir. 2023) (citing *Logan v. City of Chicago*, 4 F.4th 529, 537 (7th Cir. 2021)). If the employer meets its burden, then the burden shifts back to the plaintiff to offer evidence that the given reason is pretextual, meaning "not merely wrong but false." *Kinney*, 76 F.4th at 646. Pretext is "a lie, specifically a phony reason for some action." *Id.* (citing *Chatman v. Board of Educ. of Chicago*, 5 F.4th 738, 746 (7th Cir. 2021)).

Defendant does not dispute that Plaintiff is a member of multiple protected classes. *See* [42] at 2. It argues, however, that Plaintiff's prima facie case fails based upon the other three elements. *Id* at 8-10.

As a threshold matter, Defendant argues that Plaintiff's failure to promote claim fails, because she never applied to or expressed interest in the Vice President

position.  *Id.* at 8.  The Court will examine this argument first before turning to the other elements.

**(a)  Plaintiff's Failure to Express Interest in the Promotion**

Defendant argues that a prima facie case for failure to promote requires the plaintiff to show that she applied for position, citing the Seventh Circuit's decisions in *Johnson v. Gen. Bd. Of Pension & Health Benefits of the United Methodist Church*, 733 F.3d 722, 728 (7th Cir. 2013) and *Hudson v. Chicago Transit Auth.,* 375 F.3d 552, 558 (7th Cir. 2004).  [42] at 8.  Plaintiff and Huber both testified that Plaintiff did not express interest in the promotion to Huber, nor did Plaintiff discuss the promotion with her prior or subsequent supervisors.  *Id.*  Defendant claims that Plaintiff's discrimination claims fails for this reason alone.  *Id.*

In *Johnson*, the court affirmed the granting of summary judgment for defendant on the plaintiff's Title VII failure to promote claims on the basis that Plaintiff did not timely apply for the promotions at issue.  733 F.3d at 733.  The court reasoned that, to establish a *prima facie* case, the plaintiff was required to offer evidence that she "applied for and was qualified for the position sought and she was rejected for that position."  *Id.* (citing *Fisher v. Avanade, Inc.*, 519 F.3d 393, 402 (7th Cir. 2008) (emphasis added)).  Likewise, in *Hudson*, the court affirmed the district court's ruling that the plaintiff failed to establish a *prima facie* case under Title VII where he did not apply to a position that was posted.  375 F.3d at 561.

Generally, where there is an application for a promotion and the plaintiff fails to apply, the plaintiff's failure to promote claim will fail.[4] *See e.g., Jaburek v. Foxx*, 813 F.3d 626, 631 (7th Cir. 2016) (summary judgment granted on failure to promote claim where plaintiff never applied for promotion); *Riley*, 829 F.3d at 891 (no *prima facie* on failure to promote claim where plaintiff applied). That was the case in both *Johnson*, 733 F.3d at 733, and *Hudson*, 375 F.3d at 561.

The court explained the basis for the application requirement in *Loyd v. Phillips Bros., Inc.*, 25 F.3d 518, 522 (7th Cir. 1994), observing that it stems from *McDonnell Douglas* itself, where the challenged hiring decision was made in an application-based hiring scheme. *Id.* at 523. The court required the plaintiff to show that he was "both qualified and had applied" for the position because a candidate would only be realistically "in the running" for a job for which there is an application, if he had applied. *Id.* In other words, failure to apply would undermine the inference that the employment decision was motivated by discrimination. *Id.*

In *Loyd*, however, the court also held that no application was necessary when an employer "does not solicit and await applications but hands out promotions on its own initiative in a nonselective, serial fashion." *Id.* Rather, a plaintiff need only establish that "had the employer approached her, she would have accepted." *Id.*

Here, as in *Loyd* and in contrast to *McDonnell Douglas*, the employer had no application process for the Vice President position. [47] ¶ 14. Instead, promotions

---

[4] This circuit has recognized an exception to this general rule, where the plaintiff demonstrates that the employer's discriminatory practices deterred the plaintiff from applying, but Plaintiff makes no such allegations here, as there was no application for the position. *See Hudson*, 375 F.3d at 558.

were recommended by Regional Managers, like Huber, and approved by Huber's superiors. [45] ¶ 24. Expressing interest to Huber was not a "requirement" for consideration. [47] ¶ 14. And the Court declines to grant summary judgment in MB's favor on this basis. As explained below, however, Plaintiff's failure to express interest in the position to Huber remains relevant, insofar as it is among the reasons that Defendant offers to support its decision to promote Nerko and Bornack over Plaintiff.

**(b)        Plaintiff's Qualifications for the VP Position**

Defendant next argues that Plaintiff's claim fails because she did not possess the qualifications for promotion to Vice President. Plaintiff claims that MB had no specific qualifications for the position. Although perhaps not formalized, the record confirms that MB has historically promoted BCMs who were consistently "the very top performers and/or who have been employed with the Bank for substantial periods from Assistant Vice President to Vice President." [43] ¶ 23 (Ex. I, ¶¶ 7–9). Ostensibly, the record shows Plaintiff could satisfy these criteria: Plaintiff managed the two Burr Ridge branches for nearly seven years, beginning in January 2012. [51] ¶ 11; [45] ¶ 2. Nerko began working as an Assistant Vice President BCM in June 2012, and was promoted in September 2018. [45] ¶ 26. Nerko's promotion suggests that Plaintiff satisfied any longevity requirement. Plaintiff also won second place in the 2017 Holiday Blitz Promotion; the Burr Ridge North Branch that she managed performed the highest on Business Balances for 2018; she met her sales goals in 2018; and she scored a perfect 100% on executive management certification testing in

January 2019. [46] at 4-6. She also possessed an advanced degree, [45] ¶ 74; has never had an employee file a complaint against her or been the subject of corrective action, [51] ¶ 10; and addressed the employee relations issues with Ms. Kilian, [51] ¶¶ 6, 8. A reasonable jury could find, based upon these facts, that Plaintiff had the qualifications for the VP role. Although she may have had issues working against her getting the promotion, as discussed above, Plaintiff need only show initially that she was qualified, "not that she was the *most* qualified." *Outley v. City of* Chicago, 354 F. Supp.3d 847, 863 (N.D. Ill. 2019).

Furthermore, Defendant argues that Plaintiff's successes after September 6, 2018 are irrelevant because the analysis focusses on whether Plaintiff was qualified at the time of the challenged employment action. *See Luckie v. Ameritech Corp.*, 389 F.3d 708, 715 (7th Cir. 2004). The Court agrees that Plaintiff must demonstrate that she was qualified for the promotion *at the time* of the promotion decision, but it finds that Plaintiff's seven years of experience as a BCM managing two branches, prior success in the 2017 Holiday Blitz promotion, and the absence of corrective action against her, are sufficient evidence from which a jury could conclude that Plaintiff was qualified for the promotion.

### (c) MB's Implicit Rejection of Plaintiff

Defendant next argues that Plaintiff cannot establish that she was rejected for the promotion because she did not ask to be considered for the promotion. [42] at 9. Not so. The record clearly demonstrates that MB did not promote Plaintiff, promoting others instead, and such proof suffices to satisfy this element. *See e.g., Steinbarth v.*

*Whole Foods Mkt.,* 72 F. Supp. 3d 916, 925 (N.D. Ill. 2014) (citing *Emmel v. Coca-Cola Bottling Co. of* Chicago, 95 F.3d 627, 629 (7th Cir. 1996) ("Indeed, some cases frame the third prong of the prima facie test differently: Rather than state that the plaintiff must be rejected from the position, they say that the plaintiff simply 'did not receive' the promotion.")); *Cruse v. Hook-Superx, Inc.*, 561 F. Supp. 993, 1001 (N.D. Ill. 2008) (stating that plaintiff must demonstrate that he "was passed over" for the position to make *prima facie* case).

### (d) Plaintiff's Qualifications vis-à-vis Nerko and Bornack

Plaintiff's prima facie case fails on the fourth element.

As a preliminary matter, Plaintiff's protected classes are Middle Eastern, brown, and Muslim. [45] ¶ 1. Nerko and Bornack are white and Caucasian, and non-Muslim, but Plaintiff does not know their religions or national origins.[5] *Id.* ¶ 25; [51] ¶ 20. Therefore, Nerko and Bornack appear to fall outside of at least two of Plaintiff's protected classes, race and color.

In her Opposition to Defendant's motion, the exclusive argument that Plaintiff advances as to why this element is met is that since MB's promotion qualifications were not "carved in stone," a person "cannot prove that the two employees receiving the promotion were better qualified" than Plaintiff. [46] at 8.

---

[5] Because Plaintiff cannot establish Nerko or Bornack's religions or national origins, her religious discrimination and national origin discrimination claims against them on this prong fail. *See e.g., Patel v. Dejoy*, No. 21-c-3456, 2022 WL 4776366, at *8 (N.D. Ill. Oct. 3, 2022) (summary judgment proper on discrimination claim where plaintiff did not know comparators' characteristics other than that they were "not Hindus, not from India"); *see also Phillipson v. Wolf*, 83 F. App'x 212, 217 (7th Cir. 2020) (summary judgment proper where plaintiff could not show proper comparators).

Plaintiff offered more at her deposition. There, she testified that she believed she was equally or more qualified for the promotion than Nerko and Bornack because: (1) she managed two branches; (2) she managed Pro Staff prior to 2018; (3) she had strong performance metrics at the end of 2018; and (4) she had a master's degree in business administration. [45] ¶ 33–34. Plaintiff testified that there were no other reasons why she believed she was equally or more qualified for the promotion than Nerko or Bornack. *Id.*

As noted above, this Court must assess Plaintiff's relative qualifications as of the time of the alleged adverse employment action*, i.e.,* the promotion decision. *See e.g., Gates v. Caterpillar, Inc.*, 513 F.3d 680, 689-91 (7th Cir. 2008) (assessing plaintiff's qualifications for position at the time of the adverse employment action)**.** Plaintiff does not dispute that her sales performance at the end of December 2018 could not have factored into the promotion decision, which was made on September 6, 2018. [45] ¶ 35. Thus, the only sales metrics that are relevant are those that Plaintiff achieved before the promotion decision was made.

Unfortunately for Plaintiff, in reviewing Nerko and Bornack's qualifications relative to Plaintiff's, it becomes evident that no reasonable fact finder could find that Plaintiff was equally or more qualified for the Vice President position.

First, Nerko and Bornack were both recommended to the Vice President position in part for their business development and leadership skills. *Id.* ¶¶ 26–27. In her recommendation memo, Huber noted that Bornack demonstrated extraordinary leadership, is well respected by her peers and staff, and consistently

provides exceptional customer service. *Id.* ¶ 27. While Plaintiff has offered evidence that she reported the issues concerning Kilian to Huber and asserts this fulfilled her responsibility, she does not refute that Huber ultimately took the lead in addressing the concern. *Id.* ¶ 12. Plaintiff also does not contest that she needed to be spoken with by her then supervisor, Brian Watson, about problems with employee retention at her branch. *Id.* ¶ 8.

In terms of sales performance, Nerko was recognized as the "Top BCM" in the region in 2014, 2015, and 2016. *Id.* ¶ 26. Recommending Nerko, Huber noted that she exceeds her sales goals in every category "year after year." *Id.* Plaintiff contends that there are no written criteria for "Top BCM," and asserts that this recognition is therefore "purely subjective," [47] ¶ 15; but Plaintiff does not dispute that Nerko received this recognition for her "extraordinary sales results those years and her leadership skills." [45] ¶ 26. Similarly, Bornack was nominated as Top BCM in 2017. *Id.* ¶ 27. In her recommendation, Huber noted that Bornack "consistently performs at a high level year after year." *Id.*

In contrast, Plaintiff has never, not once, received the Top BCM recognition— by Huber or any of Plaintiff's prior supervisors. Instead, in the several months leading up to the promotion decision, Plaintiff fell short on her short-term and annual goals; her low-cost deposits and DDA numbers were down; and Huber had to admonish her that she needed to improve her business deposits, DDA, money market, consumer DDA, and consumer NOW accounts. [45] ¶¶ 20–21.

In terms of years of experience, Bornack had been a BCM for over 16 years when she was promoted. *Id.* ¶ 27. In contrast, Plaintiff worked as an Assistant Vice President since January 2012, thus, for only 7 years. *Id.* ¶ 11. Bornack had been a BCM for nearly *a decade* more than Plaintiff.

While Nerko had only been an Assistant Vice President BCM since 2012, her other achievements undermine any claim by Plaintiff that she and Nerko remained comparable. For example, Nerko: (1) had been nominated to be a part of the Ocean 11 group for managers who are successful in business development; (2) served as a point person in the region for other managers; (3) successfully managed the Always-On program; and (4) previously volunteered to have her branch test a platform for the Retail department. *Id.* ¶ 26. Additionally, in 2018, the year in which she was promoted, Nerko managed Pro Staff in Huber's region and had previously managed two branches. *Id.* ¶ 35. And Nerko beat Plaintiff in the Blitz contest Plaintiff points to as proof of her credentials. *See* [46] at 6; [45] ¶ 74 (Ex. FF). Nerko also won the "Almost Bye Summer Contest" in August 2018. [45] ¶ 70. Given her sales achievements and demonstrated leadership skills, the evidence in the record demonstrates that Nerko had all of Plaintiff's qualifications, and more.

Because Plaintiff has not offered evidence from which a reasonable fact finder could conclude that Nerko and Bornack were not better qualified, she cannot make out a *prima facie* case. Her discrimination claims fail on this basis.

### (e) Non-Discriminatory Reasons and Pretext

Even if Plaintiff could establish a *prima facie* case, the burden would shift to Defendant to articulate nondiscriminatory reasons for the promotion decision, and then to Plaintiff to establish pretext. *See Barnes v. Bd. Of Trs. Of the Univ. of Ill.*, 946 F.3d 384, 389 (7th Cir. 2020) (citing *Riley*, 829 F.3d at 891-92). In the absence of pretext, this court "does not sit as a super personnel department that reexamines an entity's business decisions." *Outley*, 354 F.Supp.3d at 868 (citing *Baron v. City of Highland Park*, 195 F.3d 333, 340 (7th Cir. 1999)).

To establish pretext, Plaintiff must show that Defendant's proffered nondiscriminatory reasons were dishonest, and the real reason is based on discriminatory intent. *Fisher,* 519 F.3d at 396. Where, as here, a defendant has offered multiple non-discriminatory reasons, showing that one of these reasons is pretextual is generally not enough. *Id.*

Through Huber's testimony, Defendant has provided the following nondiscriminatory reasons for the promotion decision: (1) Plaintiff did not express interest in the promotion, while Nerko and Bornack did on multiple occasions; (2) she had not supervised Plaintiff for long enough to know whether to recommend her for the promotion; (3) in the nine months when Huber had supervised Plaintiff, Plaintiff's branch's had significant employee relations problems that Huber had to address herself; and (4) sales at Plaintiff's Burr Ridge North Branch faltered. [43] ¶ 31 (Ex. J ¶¶ 31–34).

25

To establish pretext, Plaintiff relies upon Ball's July 18, 2018 email in which he described Plaintiff as a "different animal." [46] at 9. Plaintiff argues that using the word "animal" when describing people of color has been described as a racist remark. *Id.* Plaintiff contends that she reported the email to Huber, and after an investigation, MB disciplined Ball. *Id.* Ball was the Head of Business Banking, and Plaintiff alleges that Business Banking had a role in reviewing performance evaluations and bonuses. *Id.* Accordingly, Plaintiff argues, Ball had a role in deciding whether Plaintiff would be promoted. *Id.* Plaintiff avers that a reasonable person could conclude that either (1) Ball "directly ensured" that Plaintiff was not promoted, and/or (2) Huber failed to consider Plaintiff for a promotion because of her internal complaint. *Id.*

Even if the Court were to accept Plaintiff's interpretation of Ball's remark (which is questionable), this email alone cannot establish pretext. *See, e.g., Outley*, 354 Supp. at 866–67 (quoting *Perez v. Thorntons, Inc.*, 731 F.3d 699, 709 (7th Cir. 2013) ("While such statements are in no way acceptable in the workplace or otherwise, 'stray remarks in the workplace are insufficient to establish that a particular decision was motivated by discriminatory animus.'")). Plaintiff has provided no evidence connecting Ball's comment to the promotion decision. *See Perez*, 731 F.3d at 709 ("Standing alone, biased comments do not establish discriminatory motive unless they were by the decision maker and can be connected to the decision.").

Nor has Plaintiff provided evidence to support her claim that Ball, or Business Banking generally, had any input in the promotion decision. *See Outley*, 354

F.Supp.3d at 366-67 (granting summary judgment for defendant on failure to promote claims where racially insensitive comments about plaintiff were made by a person who was not a decisionmaker in the promotion process and could not be connected to the decision). Plaintiff merely offers a conclusory statement in an affidavit for which she provides no factual foundation, wherein she states that "Business Banking was required to sign off on her bonuses and reviewed her performance evaluations." [47] ¶13 (Ex. A ¶ 15). When asked at her deposition how she knows that Business Banking signed off on bonuses, reviewed performance evaluations, or was involved in deciding who gets promoted in rank, Plaintiff could not provide a coherent response, much less lay any record for admissible evidence for trial. *See* [43] (Ex A.: 108:20–111:20). Instead, she repeatedly resorted to the vague assertion that "it was common knowledge." *Id.*

Plaintiff's unsupported conclusory statements do not give rise to a genuine dispute of material fact. *See Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016) (citing *Nichols v. Mich. City. Plant Planning Dept.,* 755 F.3d 594, 599 (7th Cir. 2014) (instructing that the plaintiff is "not entitled to the benefit of inferences that are supported only by speculation or conjecture")).

This is especially so in the face of the other evidence in the record undermining Plaintiff's unfounded claims. For example, Mary Valenzia, Business Banking's Regional Manager in 2018, testified that Business Banking employees like her played no role in "evaluating any Retail BCM's performance, preparing their annual performance evaluations, or establishing or approving their compensation terms,

27

such as raises or bonuses" or "determining the officer rank of any Retail employees, such as BCMs, or recommending retail employees for promotion in officer rank." [51] (Ex. GG ¶¶ 5–6). Valenzia testified that she never spoke with Huber, Millins, or any other Retail manager about whether any Retail BCM (including Plaintiff, Nerko, or Bornack) should be promoted in rank to Vice President. *Id.* (Ex GG. ¶ 7).

Plaintiff's claim that Huber passed her over because of her internal complaint, remains equally unsupported by evidence. In fact, the undisputed evidence in the record shows just the opposite: when Plaintiff informed Huber of the email, Huber promptly forwarded the email to Human Resources and Plaintiff' second-level supervisor, Millins; had a conversation with Plaintiff about the email and told her it should be promptly reported; and told Plaintiff she disapproved of the comment; moreover, MB ultimately disciplined Ball. [45] ¶ 45. Huber also never said anything derogatory to Plaintiff about her internal complaint against Ball. *Id.* ¶ 58. The two had a positive relationship and even share two protected classes, color (brown) and religion (Muslim). *See id.* ¶ 9–10. Plaintiff has offered no evidence to demonstrate animosity on Huber's part, and even admitted that Huber did not retaliate against her. *Id.* ¶ 53.

Moreover, Plaintiff argues that Huber having supervised Nerko and Bornack longer than Plaintiff is "no excuse" for failing to promote her. [46] at 9–10. But a supervisor's prior experience working with an employee is a legitimate non-discriminatory basis for an employment decision. *See, e.g., Williams v. Atrium Vill.*, No. 02-C-1857, 2004 WL 816442, at *1, 8 (N.D. Ill. Mar. 15., 2004) (holding that

defendant's prior work relationship with chosen candidate was a legitimate, nondiscriminatory reason); *see also Hobbs v. City of Chicago*, 573 F.3d 454, 461 (7th Cir. 2009) (defendant appointed other candidate on recommendation of person who worked with him and knew of his work ethic for over thirteen years).

Finally, Plaintiff conceded during her deposition that none of the statements made by Huber in her recommendations of Nerko or Bornack were false, all of which demonstrate that Nerko and Bornack were highly qualified candidates. [45] ¶ 28.

Summary judgment is the "'put up or shut up' moment in the lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003) (citing *Schacht v. Wisconsin Dep't of Corr.,* 175 F.3d 497, 504 (7th Cir. 1999)). Fatal to her discrimination claims, Plaintiff has offered no evidence, only conclusory allegations and theories, to suggest that Huber's reasons for failing to promote her were pretextual. *See Abuelyaman v. Ill. State Univ.*, 667 F.3d 800, 812 (7th Cir. 2011) (noting that "wholly conclusory beliefs" that a plaintiff has been discriminated against do not suffice to create a triable issue of fact).

**B**. **Ortiz Analysis**

Under *Ortiz*, this Court must assess Plaintiff's evidence cumulatively and determine whether it would permit "a reasonable fact finder to conclude" that Defendant failed to promote Plaintiff because of her race, color, religion, or national origin. 834 F.3d at 765. Viewing the record as a whole here, this Court finds that the record does not support such a conclusion.

29

As discussed above, the only evidence Plaintiff offers to suggest the failure to promote her was based on her protected characteristics is the email from Stephen Ball, which she alleges demonstrates race or color animus. *See* [43] (Ex A.: 108:20-111:20). But Plaintiff has failed to set forth any evidence from which this Court could reasonably infer that Ball, or anyone in the Business Banking department, had any input in the promotion process, much less that they actually had any race or color animus. She thus fails to connect the purported animus to the promotion decision, and any such claim remains purely speculative.

Plaintiff does not dispute that Huber, Millins, Drinan, Sheils, and Wildman were involved in the promotion recommendation and review process. *See* [45] ¶ 24.

During her deposition, Plaintiff was given several opportunities to point to evidence from which it could be inferred that she was not promoted because of her protected characteristics. *See* [43] (Ex. A: 187:9-191). She could not do so. Instead, Plaintiff testified:

(1) She had a positive working relationship with Huber, and received a raise during the only year she worked for her, [45] ¶ 10;

(2) Other than Plaintiff raising her concerns about Ball's email, Plaintiff never told Huber that she believed she had been subjected to harassment or discrimination based on her race, color, religion, or national origin, *id.* ¶ 37;

(3) She had a positive working relationship with Millins, and while working under him was promoted and received raises every year, *id.* ¶ 6–7;

(4) When Plaintiff reported Ball's email to them, both Huber and Millins expressed disagreement with the email, offered support, and ensured or confirmed that Human Resources was investigating, *see id.* ¶ 45–46.

(5) Millins, Sheils, Wildman, and Drinan did not discriminate her based on her race, color, religion, or national origin, or say anything derogatory about her protected characteristics, *id.* ¶ 38; and

(6) Other than raising concerns about Mr. Ball, Plaintiff did not report to anyone at MB any other concerns that she had been subjected to harassment, discrimination, or retaliation because of her race; color, religion, or national origin, and no other employee, manager or supervisor at MB (or Fifth Third) made any other derogatory comments about Plaintiff's protected classes, *id.* ¶ 50.

Had MB fired Plaintiff, the above evidence, showing that she arguably performed acceptably, may support a discrimination claim. But MB did not fire Plaintiff; it merely elected to promote two other women over her who were more qualified. The evidence supports MB's explanation for why it made that election; it does not support Plaintiff's claim that the election stemmed from discrimination. The record confirms that Plaintiff was not promoted because in the short time that Plaintiff worked for Huber, Huber observed her having challenges properly managing her subordinates and meeting her sales goals; Huber instead promoted Nerko and Bornack for advancement because Huber had long-established relationships with them, because they both demonstrated a desire to be promoted, and because they were both highly qualified. In short, whether viewed under *McDonnell Douglas* or holistically, Plaintiff's discrimination claims fail, and this Court grants summary judgment in Defendant's favor on Counts I through VIII.

## B. Retaliation Claims

Title VII prohibits an employer from retaliating against an employee "because he has made a charge, testified, assisted, or participated in any manner in an

investigation, proceeding, or hearing."  42 U.S.C. § 2000e-3(a).

To defeat summary judgment, Plaintiff must offer evidence from which a reasonable jury could find that: (1) she engaged in an activity protected by the statute; (2) she suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action.  *Lesiv v. Illinois Cent. R.R. Co.*, 39 F.4th 903, 911 (7th Cir. 2022); *see also Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016) (noting that the Title VII framework applies with equal measure to IHRA claims).  The relevant question is: "Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused 'the materially adverse action?'" *Lesiv,* 39 F.4th at 911 (quoting *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016)).  Like Plaintiff's discrimination claim, Plaintiff's retaliation claim "must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself." *Id.* (citing *Ortiz*, 834 F.3d at 765).

During the course of this litigation, Plaintiff has only advanced two theories of retaliation.  In her Complaint, Plaintiff alleged that she was retaliated against for filing a discrimination charge with the IDHR in January 2019.  *See* [6-1].  In her Opposition to Defendant's motion, Plaintiff abandoned this theory of retaliation altogether.  Plaintiff ignores Defendant's arguments challenging her retaliation claims based on the IDHR charge, instead advancing a new theory—that she was

retaliated against in response to her internal complaint to Human Resources about Ball's email. [46] at 10–11.[6]

Defendant further argues it is entitled to summary judgment on Plaintiff's retaliation claims based upon the IDHR charge, because Plaintiff has offered no evidence of a materially adverse action taken after the filing of a charge, since she was passed over for the promotion before she filed the charge. [42] at 13. Plaintiff also does not dispute that Hollivay, her supervisor from May 3, 2019, through November 15, 2019, did not know of Plaintiff's IDHR charge until 2022, after Plaintiff had already resigned. Thus, Hollivay could not have taken retaliatory action in response to the charge. *See id.*

Additionally, Defendant notes that Plaintiff testified that she does not know whether Ball knew that Plaintiff filed the IDHR charge; and even if he had, Plaintiff testified that she cannot identify any specific retaliatory actions taken by Ball. *Id.* (citing [45] ¶ 54). Moreover, Plaintiff testified that Huber never retaliated against Plaintiff because she filed the charge, nor said anything to Plaintiff about the charge. *See* [42] at 13 (citing [45] ¶ 53).

---

[6] Defendant argues that Plaintiff has waived her retaliation claims based upon her IDHR charge by failing to respond to any of the arguments in Defendant's opening memorandum in support of summary judgment. *See* [50] at 13. Courts have found that plaintiffs waived claims by not adequately developing them at summary judgment. *See, e.g., Lewis v. Indiana Wesleyan Univ.*, 36 F.4th 755, 760-61 (7th Cir. 2022) (citing *Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 925 (7th Cir. 2019) (affirming district court's finding that age discrimination claim waived because plaintiff failed to adequately develop it in her opposition to summary judgment)); *see also Barnes v. Northwest Repossession, LLC*, 210 F. Supp. 954, 970 (N.D. Ill. 2016) (defendant entitled to summary judgment on claim when plaintiff failed to respond to arguments raised in motion); *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562, n.2 (7th Cir. 1996) (same).

Based upon this record, Defendant prevails. To establish retaliation, the individual retaliating against the plaintiff based on the IDHR charge must have actual knowledge of the charge. *See, e.g., Hobbs v. City of Chi.*, 573 F.3d at 463 (citing *Tomanovich v. City of Indianapolis*, 457, F.3d 656, 668 (7th Cir. 2006) ("To establish retaliation for a discrimination complaint, the employer must have actual knowledge of the complaint.")). Plaintiff cannot establish this knowledge with respect to Ball or Hollivay, and she conceded that Huber never retaliated against her based on the charge. Thus, Plaintiff has failed to offer any evidence from which a reasonable jury could conclude that she was subject to retaliatory action in response to the discrimination charge.

Plaintiff's claim that MB retaliated based upon her internal complaint about Stephen Ball's email fails for similar reasons that Plaintiff's discrimination claim fails. First, Plaintiff raised this theory for the first time on summary judgment. *See Whitaker v. Milwaukee Cty., Wis.,* 772 F.3d 802, 808 (7th Cir. 2013) (noting "a party may neither amend its pleadings by argument in opposition to summary judgment nor introduce new theories of liability in opposition to summary judgment"); *see also Abuelyaman*, 667 F.3d at 815 (Plaintiff's retaliation claim failed because he did not present theory until summary judgment).

But even if Plaintiff had properly raised and preserved this claim, Plaintiff has still failed to establish the requisite causal link between the alleged protected activity and the adverse action taken. *See Lesiv,* 39 F.4th at 911.

In her Opposition, Plaintiff asserts a theory of retaliation similar to her pretext argument. She asserts that: (1) Plaintiff complained to Huber about Ball's email; (2) Plaintiff suffered an adverse job action, i.e., failure to promote; (3) a causal connection exists because Ball is the Head of Business Banking, and Business Banking is involved in promotions to Vice President; and (4) Huber then failed to consider Plaintiff for the promotion. [46] at 11. But the absence of any evidence to support her claim that Ball (or anyone else in Business Banking) had anything to do with the promotion decisions undermines her theory completely. And, as explained above, Plaintiff has also failed to offer any evidence from which a reasonable jury could conclude that Huber failed to promote Plaintiff based upon her complaint about Ball. Instead, the evidence demonstrates that, after learning about the email, Huber supported Plaintiff, including encouraging her to file an internal complaint with Human Resources and reporting the email herself. [45] ¶ 45. Thus, Plaintiff's retaliation claims fail as a matter of law.

For these reasons, this Court grants summary judgment to Defendant on counts X and XI.

## IV.    Conclusion

For the reasons explained above, this Court grants Defendant's motion for summary judgment [41] and directs the Clerk to enter judgment in Defendant's favor on all of Plaintiff's claims.

Date: September 29, 2023              Entered:

John Robert Blakey
United States District Judge

36